IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES E. WARD, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED AIRLINES, INC.,<br><br>    Defendant.<br>_____/ | No. C 15-02309 WHA<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

### INTRODUCTION

In this certified class action involving alleged deficiencies on pay stubs for airline pilots, both sides move for summary judgment. To the extent stated below, defendant's motion for summary judgment is **GRANTED**. Plaintiff's is **DENIED**.

### STATEMENT

At all relevant times, plaintiff Charles E. Ward worked as a pilot for defendant United Airlines, Inc., a major passenger airline serving destinations all over the world. Ward resided (and continues to reside) in Marin County. A prior order certified a class defined as follows (Dkt. No. 44 at 14):

> All persons who are or were employed by United Airlines, Inc., as pilots for whom United applied California income tax laws pursuant to 49 U.S.C. 40116(f)(2) at any time from April 3, 2014 up to April 3, 2015.

Section 40116(f)(2) of Title 49 of the United States Code provides two means for determining which state's income tax laws applies to an airline worker: (i) the state of the employee's

residence, or (ii) the state in which the employee earned more than fifty percent of his or her pay. United applied California tax laws to the class members (and all pilots nationally) based on their place of residence, because its pilots rarely, if ever, performed more than half their work in any one state (Spars Decl. ¶ 5).

All agree that the class members have been fully paid their compensation; the disagreement is over the form of statement of wages. All got a statement but class counsel insists the statement should have followed the California-prescribed form of statement. This order disagrees.

Class members spent less than an average of twelve percent of their total work time within California, which broke down to approximately three percent of the total work time on flights entirely within California and eight-and-a-half percent of the time on flights within the geographical bounds of California on flights in or out of California. The record does not, however, reflect the range of the class members' time in California nor whether any pilot spent a majority of his or her flight time in California during any bid period. Of the examples provided by United, the greatest amount of work time spent in California in a single bid period was forty-two percent. Ward himself spent a maximum of thirty-six percent of his work time in California, though he averaged twenty percent in 2014 and fifteen percent in 2015 (Baker Decl. ¶¶ 8, 11, 20–21).[1]

United assigned routes to pilots according to schedules that roughly equated to calendar months called "bid periods" (so called because pilots could bid for particular routes, which United assigned according to seniority). In a given bid period, a pilot could work as a lineholder pilot, meaning United assigned him or her a predetermined flight schedule, or a reserve pilot, meaning he or she remained on call to fly segments as-needed. A collective bargaining agreement between United and the Air Line Pilots Association, established pursuant

---

[1] Ward objects to evidence of pilots' time spent in California on relevance grounds because he contends the pilots' place of residence is dispositive of the issues herein without regard to the location of the work. As discussed in greater detail below, the applicability of California's wage-statement statute depends on the location of the work performed. Thus, this evidence is highly relevant. Ward's relevance objection incorrectly assumes that his legal arguments prevail. Accordingly, that objection is **OVERRULED**.

1  to the Railway Labor Act, governed the terms and conditions of employment for United's
2  pilots, including the scheduling procedure and compensation structure (White Decl. ¶¶ 2–3).
3       United paid its pilots twice monthly, on the first and the sixteenth day of each month.
4  The collective bargaining agreement set forth three methods for calculating a pilot's total pay
5  for a bid period: (i) line-pay value, (ii) minimum-pay guarantee, and (iii) protected-time credit
6  (available only to lineholder pilots). A pilot's total compensation for a bid period would be the
7  largest of the three measures. United, however, calculated the amount of the first payment in a
8  bid period (on the first of the month) based on a formulaic estimate of the total hours it
9  anticipated the pilot would work during the pay period. United called this first payment a
10 "Flight Advance." The second payment (on the sixteenth of the month) amounted to the
11 difference between the Flight Advance and the total compensation owed to the pilot for that pay
12 period (again, the greater of the three measures identified above) plus certain bonuses (called
13 "add pay") (KohSweeny Decl., Exh. G; White Decl. ¶ 4).
14      The line-pay value constituted the primary means of calculating each pilot's
15 compensation, and United calculated it as the pilot's time spent performing various work
16 activities (such as piloting, co-piloting, taxiing, training, or flying as a passenger on a flight in
17 order to start an assignment from a different city) multiplied by the applicable rates for each
18 respective activity as set forth in the collective bargaining agreement. The determination of the
19 applicable rates depended not only on the nature of the activity, but also the type of aircraft, the
20 pilot's title, and the pilot's seniority. The minimum-pay guarantee (available to all pilots) and
21 the protected-time credit (available only to lineholder pilots) each calculated total pay based on
22 a formula relating to a pilot's assignments, rather than his or her actual hours worked. This
23 ensured that pilots did not get penalized for accepting shorter flight segments (which yielded
24 lower compensation) or for unavoidable circumstances such as flight cancellations or schedule
25 changes. In other words, the latter measures could only be triggered if a pilot's actual time
26 worked during a bid period fell short of the amount expected based on his or her assignment for
27 that period (White Decl. ¶¶ 7–8).
28

As stated, the amount of a pilot's first paycheck in a bid period (the Flight Advance) never related to the hours the pilot actually worked during that bid period. The second paycheck in a bid period only related to the hours the pilot actually worked if the greatest of the three measures identified above was the line-pay value.

United issued a "pay advice" to each pilot, which detailed the pilot's wages for the given pay period. For pilots who received paper paychecks, United issued pilots' pay advices appended to the checks. For pilots who received payment via direct deposit, United delivered the pay advices through its internal website and offered pilots the option to receive a paper copy in the mail. The pay advices did not list pilots' hours worked or the applicable rates, regardless of the applicable method of compensation. United listed a post office box maintained by its payroll department as the address on its pay advices.

United also maintained a real-time register of each pilot's work activities during a bid period, including the hours worked and applicable rate for each such activity. Each pilot could access his or her respective pay register (including archives of prior bid periods) via United's internal website. Although neither the Railway Labor Act nor the collective bargaining agreement required United to use this particular design to issue wage statements, the format used by United was nevertheless influenced by the complexity of the collective bargaining agreement. For uniformity nationwide, United used the same format across the country (and still does) (Spars Decl. ¶¶ 2–3; Spars Dep. at 17–19; White Decl. ¶ 10; White Dep. at 18–19, 22–23).

Ward commenced this action in state court in San Francisco in April 2015, and United removed it to federal court pursuant to the diversity jurisdiction provision of the Class Action Fairness Act. Ward claims that United violated various provisions of Section 226(a) of the California Labor Code, which requires employers to provide certain information on wage statements issued to employees. Ward also asserts claims under the Private Attorneys General Act. In March 2016, an order certified a class for all claims. Both sides now move for summary judgment. The opt-out period has closed. This order follows full briefing and oral argument.

4

**ANALYSIS**

Section 226(a) of the California Labor Code provides, in pertinent part:

> Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees . . . an accurate itemized statement in writing showing . . . (8) the name and address of the legal entity that is the employer . . . and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . . .

Ward contends that United violated Section 226(a) because it provided only a post office box as its address and because it failed to itemize the applicable rates and hours worked at each rate when it issued pay advices (applicable only to pay periods for which a pilot received payment via the line-pay value). United responds that Section 226(a) does not apply to the wage statements because, although all class members *reside* in California (at least for payroll tax purposes), they did not work principally in California. Thus, United contends, because the California legislature did not "clearly express" an intention for Section 226(a) to apply to work performed primarily outside the state, nor could such an intention be reasonably inferred "from the language of the act or from its purpose, subject matter or history," it cannot apply to the wage statements United issued to its pilots. *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (citations omitted). Further, United argues, to the extent any class member worked principally in California for a given bid period, the application of Section 226(a) in those circumstances would run afoul of dormant commerce clause preemption. Each issue is addressed in turn.

1. **SCOPE OF SECTION 226(a)**.

Both sides agree that Section 226(a) does not apply extraterritorially (Pl.'s Opp. at 4). Ward does not dispute that the class members did not work principally in California. The dispute herein is whether the application of Section 226(a) to wage statements issued to California residents for work primarily performed out of state constitutes extraterritorial application of the law. Ward contends this would not constitute extraterritorial application because the issuance of the wage statement itself occurred in California.

5

No decision has directly addressed whether Section 226 applies to wage statements issued to California residents who worked principally out of state. The few decisions that have evaluated whether California's wage-and-hour laws and workplace-discrimination laws apply to out-of-state work performed by California residents uniformly rejected that proposition. Instead, those decisions focused on the "job situs test," which considers where an employee "principally" worked. *See Anderson v. CRST Int'l, Inc.*, 2015 WL 1487074 (C.D. Cal. Apr. 1, 2015) (Judge Dale S. Fischer); *Priyanto v. M/S Amsterdam*, 2009 WL 175739 (C.D. Cal. Jan. 23, 2009) (Judge Howard Matz); *Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 478 (2000); *Tidewater Marine Western, Inc. v. Bradshaw*, 14 Cal. 4th 557 (1996). Indeed, that test has long governed the scope of federal labor law. *See Oil, Chemical, and Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 418–20 (1976).

Ward argues that the decisions applying the job situs test are distinguishable because our case does not involve laws that govern the nature of the work performed but rather the form of the wage statements. The only authority he cites for his position is a dictum in *Sarviss v. Dynamics Information Technology*, 663 F. Supp. 2d 883, 899–900 (C.D. Cal. 2009) (Judge Dean D. Pregerson). In *Sarviss*, the plaintiff resided in California and trained helicopter pilots in Pakistan. The plaintiff spent only brief periods of time working in California and performed the bulk of his work abroad. He sought overtime pay and premium wages for missed meal periods and rest breaks solely for the work performed outside the state. Judge Pregerson rejected the plaintiff's argument that his place of residence determined whether the wage orders should apply, electing instead to focus on the "*situs* of the employee's work . . . ." *Id.* Accordingly, Judge Pregerson granted summary judgment for the employer on those claims.

Ward focuses on a separate discussion in *Sarviss*, which addressed a motion to certify a class based on violations of Section 226 arising from the employer's failure to include its name and address on its wages statements. Judge Pregerson did not certify the class because plaintiff failed to provide evidence that his employer used the same format for all wage statements across the putative class. Nevertheless, Judge Pregerson's separate discussion of the wage-statement claim (rather than together with the discussion of the merits of the other claims)

6

1    carried the implicit assumption that, unlike the overtime, meal period, and rest break claims,
2    Section 226 could apply to at least some of the plaintiff's wage statements, even if the plaintiff
3    principally worked outside of California. The decision in *Sarviss*, however, never addressed
4    that problem directly. (Nor, for that matter, did the briefs on the motion for summary judgment
5    therein.)

6    Ward argues, relying on that separate discussion in *Sarviss*, that Section 226 governs the
7    form of the wage statements issued by United to its employees residing in California regardless
8    of where the work occurred. The order certifying the class herein acknowledged that *Sarviss*
9    appeared to rely on the implicit assumption that Section 226 could apply to wage statements
10   issued to California residents even if the employees did not principally work in California.
11   Contrary to Ward, however, our class certification order *did not* hold that *Sarviss* conclusively
12   supported his position. Rather, it held that Ward's theory could be evaluated on a class-wide
13   basis, but it expressly noted, "United may ultimately persuade the Court that California's wage-
14   statement laws should only apply when a pilot principally worked in California, as
15   contemplated by the discussion in *Sarviss* regarding breaks and overtime" (Dkt. No. 44 at 8).
16   Ward omits that statement in his citations to the class certification order.

17   Ultimately, the fact that our case concerned wage statements, while the substantive
18   aspect of *Sarviss* concerned the actual performance of work (and compensation therefor) is a
19   distinction without a difference. Indeed, the principal purpose of Section 226 is to enable
20   employees to vet the accuracy of their compensation. *See Morgan v. United Retail, Inc.*,
21   186 Cal. App. 4th 1136, 1149 (2010) (citations omitted). That is, Section 226 is in place to
22   enable employees to verify that they have received the protections of California's wage-and-
23   hour laws that all agree *are* subject to the job situs test, so it serves as an extended form of
24   protection. Thus, this order holds Section 226 must be subject to the same jurisdictional limits
25   as the wage-and-hour statutes and regulations to which it relates.

26   Ward's interpretation would yield absurd results. An employer in Nevada would need
27   to apply Nevada wage-and-hour law to all paychecks, but it would need to comply with the
28   wage-statement laws of each state of residence of its employees. Similarly, a California wage

7

earner who resides elsewhere would not be entitled to the added protections guaranteed by California's wage-statement statute.  The California Legislature could not have intended for its wage-statement laws to cause such confusion for out-of-state workers while the substantive protections for workers remained confined to the work within state borders.  Nor could it have intended to deprive California wage earners of the protection offered by the wage-statement law simply based on their place of residence.[2]

Thus, at least for class members who worked primarily outside of California, Section 226 — like the rest of California's labor laws — does not apply.

### 2.  DORMANT COMMERCE CLAUSE PREEMPTION.

The evidence submitted by United speaks to the average time spent worked in California by the class *as a whole*, except for a single statement that United applied state-law tax based on pilots' residence, because few, if any, pilots work more than fifty percent of the time in a single state.  Ward does not dispute United's assertion that none of the class members principally worked in California in any given bid period, but even United's own evidence indicates that certain pilots worked in California for more than a third of a particular bid period.  Nevertheless, this possibility is not fatal to United's motion, inasmuch as requiring United to comply with Section 226 in those limited circumstances would unduly burden interstate commerce.

The United States Constitution affirmatively grants the federal legislature the power to regulate interstate commerce.  It is a long recognized principle that this grant limits "the power of states to enact laws imposing substantial burdens on [interstate] commerce."  *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).  A state law that places an undue burden such that it exceeds the local benefits of the law, therefore, runs afoul of so-called "dormant commerce clause" preemption.  *Pike v. Bruch Church, Inc.*, 397 U.S. 137, 142 (1970).

As discussed above, the benefit conferred by Section 226(a) is to ensure that California wage earners are informed about their compensation in order to enable them to defend their

---

[2] United identified thirty-seven states plus Washington, D.C., with different wage-statement laws (Def.'s Mtn. at 13 n.9).

8

substantive rights. That local benefit, however, is outweighed and even undermined by the burden that would result from the application of Section 226(a) and comparable laws in other states to this class of pilots. To be clear, the burden in question is not simply caused by requiring United to list the rate and hours worked on the wage statements. Rather, the concern is the administrative burden of complying with the patchwork of state wage-statement statutes and regulations (and subsequent interpretations and developments thereof). If Section 226(a) and equivalent state laws applied to this class, United could be required to give an individual pilot a different form of wage statement in each bid period, depending on whether that pilot worked principally in California or some other state. United would need to monitor the pilot's precise hours spent working in each state and determine which state's laws applied in that bid period. Indeed, multiple states' laws could apply simultaneously. Beyond the administrative challenge, this would also cause frequent confusion among the pilots who would be unable to make sense of the inconsistent formats of the wage statements — the very problem sought to be solved by Section 226(a). This order holds that such a burden outweighs the local benefits, and thus cannot be applied to this class.

In *United Air Lines, Inc. v. Indus. Welfare Commn.*, 211 Cal. App. 2d 729, 748–49 (1963), *disapproved of on other grounds by Indus. Welfare Com. v. Super. Ct.*, 27 Cal. 3d 690 (1980), the California Court of Appeal considered a state regulation requiring employers to reimburse employees for the cost of their uniforms as applied to flight attendants. Because the statute as applied would have caused "a most anomalous situation" — flight attendants based in different states might receive different compensation even as they worked side-by-side on the same flight — the California Court of Appeal held it triggered dormant commerce clause preemption.

Ward counters that *United v. IWC* is inapposite, inasmuch as it concerned the differences in compensation among flight attendants who resided in different states and "personnel troubles" that would result from those differences, while our case does not involve any personnel troubles. Ward is correct that *United v. IWC* concerned a different type of burden on interstate commerce from the burden herein. That is, our case does not involve

9

compensation differences among employees, but rather administrative burdens. Although our case would not result in personnel disputes, the burden imposed by applying Section 226(a) and equivalent statutes in other states is no less substantial.

Ward also argues that the California Labor Code has been routinely applied to nationwide corporations as well as transportation workers without triggering any dormant commerce clause preemption. Ward's argument misses the point. None of Ward's citations involved *employees* who themselves worked in a patchwork of states on a regular basis. Rather, they involved employees who regularly worked in a single state, even if the employers also employed individuals in other states.

For example, Ward notes that in *Angeles v. U.S. Airways, Inc.*, No. 12-5860, 2013 WL 622032, at *10 (N.D. Cal. 2013) (Judge Charles R. Breyer), Section 226 applied to employees of an airline company that operated flights across the country. He conveniently ignores the fact that the plaintiff and the members of the putative class therein were ramp agents each of whom who worked at a single airport — avoiding the need to consider issues of extraterritoriality or burdens on interstate commerce.

Similarly, Ward cites *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 955, 960 (2011), in which the California Court of Appeal held that Section 226 applied to employees of a warehousing business that delivered groceries to stores. The *employer* offered its services in California, Nevada, and Hawaii, but that decision never addressed whether the *plaintiffs* themselves ever worked outside of California.

Ward does not cite a single decision addressing the problem herein — the application of California labor law to individual employees each of whom performed work in a patchwork of states, with rare instances of pay periods in which the employees worked in California for a majority of their time. Nor can he. Ward's arguments might have legs if we were dealing with a regional airline that flew exclusively or primarily in California, or a class of pilots within United who exclusively took limited assignments primarily in California, but that is not our case. To the extent any pilot worked principally in California for any bid period, the application

of Section 226(a) and equivalent state laws in these circumstances would impose too great an administrative burden on United's interstate and international airline business.

Accordingly, United is entitled to summary judgment on all claims.

## CONCLUSION

To the extent stated above, defendant's motion for summary judgment is **GRANTED**, and plaintiff's motion for summary judgment is **DENIED**. To be clear, this is a holding against the entire class. Final judgment will follow.

**IT IS SO ORDERED.**

Dated: July 19, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE